The first case is Rivero v. Univ. N.M. Board of Regents 18-2158. Council, we're ready to hear you. Thank you, Your Honors, and may it please the Court. My name is Eric Norvell and I represent the appellant, Dr. Dennis Rivero. Dr. Rivero is a renowned and respected orthopedic surgeon. He's sued the University of New Mexico under the Rehabilitation Act of 1973, 42 U.S.C. 12-112-D4A, and for constructive discharge related to the same. He's appealing several issues that were ruled against him on a blanket ruling by Judge Browning at the district court level on summary judgment. Dr. Rivero's background, Dr. Rivero had worked for U.N.M. for 14 years, 14 to 16 years, when in 2006 he decided to branch out into private practice. He was persuaded to stay on .05 FTE, which had been promised that he would be back at full time, but ran into some obstructions in getting to full time, namely administrative obstructions. He was continually reappointed at the .05 FTE level for the next several years while he waited the increase in time to .75 or higher FTE with a clean bill of psychological slate, clean medical slate, no issues whatsoever. Finally, in 2011, when U.N.M. proposed a condition of employment, they provided him with an addendum to his employment contract, which included a four-part battery of psychiatric examinations in order to return him or to increase his employment to .75 FTE or higher. There was no basis for this psychiatric examination provided. Simply previous conversations had discussed counseling, not psychiatric examinations. Dr. Rivero then embarked on seeking a basis for U.N.M.'s insistence on these psychiatric exams and was obstructed when he requested his own file. He had to file a petition for administrative mandamus in the state court and after several years of litigation, two and a half years, the court ruled against U.N.M., said it was an unlawful withholding and he was provided the file. Within the file, there was no evidence of, there was no evidence of any rationale for a psychiatric examination. There was no reference of the word psychiatric in his file except with respect to the addendum. Dr. Rivero then, the U.N.M. then certified that all documents had been produced through affidavits by two administrators. At that point, Dr. Rivero, having known there was no basis for this psychiatric examination, resigned from U.N.M. Just to try to focus this a bit, the trial judge entered a 300-page memorandum of opinion and amended order. Yes, he did. Could you at least help focus our mind just a bit by telling us what part of the 300-page memorandum and order is the error that you contend the court... The statute of limitations itself is not at issue. It's a three-year statute of limitations. From the time that the cause of action accrued. From the time that a complete and present cause of action accrued. Accrued, right. Under Green v. Brennan. Right. But does not require that you have knowledge of any affirmative defenses. And an affirmative defense is what you're kind of saying you discovered late, so I'm assuming I'm a little troubled why he knew that a request was made for him to submit to a psychiatric exam outside the three-year period. He knew that was a requirement. Why didn't that start the running of the statute of limitations for a Rehabilitation Act claim? The discrimination claims, if you look at... When you say the discrimination claims, we're really dealing just with the Rehabilitation Act right now, isn't that correct? Yes, we are. Okay, so let's just focus on that. Okay, the Rehabilitation Act, in particular medical inquiries, improper medical inquiries. The district court had cited as a foundation for its holding, Williams v. FedEx, which states that all you need is employment and an exam requested. I asked the court to take up a re-examination of that particular requirement because I don't believe that it overcomes the standards of pleading that are required, and Dr. Rivero would not have been able to file an adequate cause of action under Iqbal or Twombly given that it would have been simply a recitation of the elements of Williams without any real factualization. He could have filed when he said, I was employed by them, a small amount, but still employed, and they required a medical exam of me, and that's my cause of action, and then wait for the defense to come in and say, ah, but it was medically necessary or for solid business  Two things, Your Honor. Under Baker v. University of Kansas, which was cited by all parties, I believe, to this matter, the... Which court was that? That was in the Tenth Circuit. Okay. And I believe it was Tenth. I can double check. I hope I'm not misrepresenting, but it was in this circuit. The plaintiff, the court held that the plaintiff had accrued a cause of action when he discovered the reason for his denial to, for admission to the University of Kansas Medical School. Now I know it's not a Rehabilitation Act claim, but there was an implicit understanding that there was a reason posited. Here, there was no reason. Here, there was no basis. Dr. Rivera was entitled to his credentialing file, which should have contained any rationale that the court may have, I mean, that the school may have had for requiring the psychiatric examination. Additionally... But wasn't his cause of action simply that he had been employed and that a medical exam was required of him? Wasn't that his cause of action? And that there was no foundation for it? No, that's the defense, right? The defense says we had a reasonable business need and necessity for it. That's not part of his cause of action. That's part of the affirmative defense. Had he filed a plain cause of action stating only those things, I believe that it would not have survived, and I don't believe that the Williams standard would survive the increased level of pleading standards that federal courts require in order to state a claim. Well, but as Judge Ebel was saying, what was missing was your response to an affirmative defense, and you don't have to anticipate something on which the defendant has the burden of persuasion. You don't have to anticipate that in your pleading. I think that's what Judge Ebel was focusing on, and I haven't heard a response to it. And my argument is that it isn't necessarily an affirmative defense, and that this... It's something on which the employer has the burden of persuasion. Do you agree on that? The employer has to show a business necessity, a business basis for requiring the medical exam. Isn't that correct? Yes, and I also believe that the plaintiff would need to have a reasonable factual basis under Rule 11 and under Iqbal and Twombly in order to posit a pleading to overcome the level of the burden of pleading to get to the next stage. Judge Lynch, the magistrate court judge who was presiding initially, ruled at the motion to dismiss level that the claim was filed timely because Dr. Rivero did not have information sufficient to allow him to timely file. And therefore, he timely filed... Let me rephrase it. Well, are you talking about Rule 11 or Iqbal and Twombly? I'm talking about the pleading standards. Okay, so Iqbal and Twombly requires you to have factual allegations that support your claim. Right, it can't just... No, it doesn't. And our position is that, just as Judge Lynch said at the motion to dismiss level, the issue of... Sorry. The complete and present cause of action did not have to do with the fact that Judge Lynch was a part of UNM. And we relied on that during the course of litigation. Litigation progressed from the motion to dismiss stage through discovery all the way through. Judge Lynch retired in the interim. Judge Browning was appointed. New judge, new bite at the apple. When you look at the Tenth Circuit Law, Williams v. FedEx, now it was dealing with an ADA case, but the standard is the same as the pleadings. It says that a plaintiff must prove, one, that he is an employee, two, that the defendant employer required him to undergo a medical examination. The plaintiff need not prove he is disabled. Just those two things. One, that he was an employee, and two, that he was required to take a medical exam. He knew both of those things more than three years before the suit was filed. Yes, he did. I have addressed Williams in my briefing, and I believe that the standard derives from whether an employee need to be shown to be disabled in order to submit the cause of action. I also believe that the pleading to that particular ruling should be reviewed with respect to that standard, because that standard, I don't believe, overcomes the burden of more than mere recitation of elements of a claim. I don't believe, because think about from a policy standard, that puts an immense amount of burden on the employee. An employer can essentially just rely on the burden being cast onto the employee in order to protest. That's burden away from the employee. It becomes a burden of the employer to say, well, there was a situation presented here that presents a serious business need for us. That's the employer's burden. It really helps the employee. In practice, these types of examinations have been used willy-nilly for various purposes, and the case law shakes out where pre-employment conditions, pre-employment tests, that the burden is then cast upon the employee to challenge it at the court level. That seems to be a fairly significant burden without requiring that the employee take, the employer take steps to offer a reason. Let's go to your other claim. I'm sorry. I'd like to reserve some rebuttal time. You can't rebut. If you want to reserve your time, you're not going to be able to argue about the constructive discharge because it's not fair to... Let's go to constructive discharge then. That's your other claim, right? No, the other claim is whether it's job-related and subject to business necessity. That's all part of the first claim. If you're barred by untimeliness on that claim, you still have a constructive discharge claim. Is that correct? That is correct. Constructive discharge was... Given the... Dr. Rivera was a revered and respected orthopedic surgeon. The administration had, as set out in my briefing, the administration had undertaken essentially a campaign against him, a tacit campaign in order to stifle his return, to force him into litigation to obtain his own file, to disparage him publicly. His own department head had essentially turn-coated on him and publicly disparaged him and said that he was... But he then stayed another two years. He stayed in anticipation of receiving documents from UNM subject to the mandamus action. And there was a risk that if he had left, that UNM would say, oh, he's not employed here anymore. We don't have a requirement to provide him any documents. The conditions continued to degenerate throughout the course of the mandamus litigation to the point of Dr. Rivera requiring... Being forced to resign. You know, I assume as a professor, he's got... He's kind of isolated, insulated. Professors come to their office, they teach, they go back to their office, they study. So the fact that some colleagues made some statements about him, I wouldn't think that would be the constant rubbing of nerves that we find in a crowded office environment. He's a clinical physician who attends to thousands of patients on an annual basis. Does he deal directly with all these other people that were testifying or that made statements derogatorily about him? Yes. I'd like to reserve the rest of my time, Your Honor. Thank you, Your Honors. Lawrence Marcus on behalf of the Board of Regents of the University of New Mexico, UNM. I want to quickly go through the facts real quick, quickly, because there are some inaccuracies made by appellant's counsel. It is true that Dr. Rivera was a physician, an orthopedic surgeon at the University of New Mexico for a little more than a decade, between 1993 and 2006. And he was... We admit that he was a technically proficient surgeon, Your Honors. The trouble is that he would have these episodes of unprofessional behavior. Were any of those confirmed? Some of them were in his own words, Your Honor. Some of them were in emails that he did not deny sending. And he admitted that he sent emails of that nature. To whom? To the patient advocate, Your Honor. There were a number of incidents. There was one incident where... If you're falsely accused or challenged on something, you can't respond harshly to that? It wasn't necessarily... It wasn't aimed at the accuser. It was aimed at the patient advocate who was trying to figure out what was going on. And in his harsh responses, they were disproportionate. They were a complete overreaction, Your Honor. For instance... And showed a psychiatric problem. They showed a lack of professionalism. A lack of a professional demeanor. That's different. I mean, I was concerned about some of the language in your brief about this... Various things weren't confirmed, but you can still order a psychiatric exam. And that troubled me. You may prevail on untimeliness, but on the substance of it, I had some serious concerns. And I'd like to hear your response. If you go through the... People lose their temper, particularly when they're accused improperly. People might use language that isn't as well thought through as they might have if they had time to parse it. And then to subject them to a psychiatric exam? Given the situation that he was in, given his job responsibilities of performing surgery on people, and he has their lives and certainly their ability to walk, for instance, literally in his hands, I think that UNM had a right to be concerned. Well, I thought it had to do with interpersonal relationships, not the quality of his surgical skills. Was there any question about the quality of his surgical skills? There was no question about the quality of his surgical skills, Your Honor. But if someone is going to act in an unprofessional manner, if he's going to talk to patients in an unprofessional way... And there have been studies. During the time period when he was... After Dr. Vero left, there was a major push by UNM and other medical institutions to improve professionalism of surgeons. You just mentioned talk to patients in an unprofessional way. The only things that you mentioned that were corroborated were statements to the patient advocate after the accusation. What confirmation is there that he spoke to patients in an unprofessional way? Well, he admitted, for instance, that he canceled the surgery because of a misunderstanding between him and a patient over funding. He decided he should not operate on this person. Just out of the middle of nowhere, because of a misunderstanding regarding the source of funding. And that shows a psychiatric problem that requires some examination. It shows a professionalism problem, and there's substantial case law saying that, even from this circuit, even in the Landman case, there's substantial precedent saying that an employer may use fitness for duty evaluations and other types of psychiatric analysis to determine the cause of unprofessional behavior without running afoul of the Americans with Disabilities Act or the Rehabilitation Act. The Landman case, there was a county... A deputy sheriff in a county in Kansas, and she had a long history of being a very well-renowned deputy sheriff, Your Honor. And she had a couple of incidents where she threatened some people and she basically lost her temper a few times. And this circuit upheld a psychiatric evaluation saying that, especially in a position like law enforcement, where health and safety are at risk, the employer has the right to determine why this person is suddenly acting unprofessional after all these years of professional behavior. These complaints that I described, they tended to be clustered within a three-year period. He had been... He had not shown much of a... He had had some earlier incidents earlier in his career, but all of a sudden, one incident after another, Your Honor, and it was incredible... You say that as if they're corroborated. Some of them were. Some of the emails, like when the patient advocate... He said something that could reasonably have been construed as comparing a patient to a monkey, whether that was his intention or not. That's how he came off. And the patient advocate confronted him about it. Well, not confronted, but asked him about it. And he told him he was wrong, wrong, and wrong in all capital letters in an email, and threatened the man's job, Your Honor. If he was so unpredictable and so potentially unqualified, why did the university keep him on for years afterwards? He was kept on for one day a month, Your Honor. But one day a month is... I mean, if he's really not safe without an exam, how could you possibly justify continuing his employment? He tended to operate on patients with other surgeons. The other surgeons were... If you felt safe with him continuing for several years after he's refusing an exam, I just don't know how... I think that undercuts your claim that you had a necessity to have that exam. He was coming one day a month. He wasn't doing... We're talking about one day a month versus more than one day a month, but he still... It was okay with you that he dealt directly with patients for several years without the lie or at least cast doubt upon the credibility of your argument that this exam was a business necessity. It was substantially... His surgeries were substantially limited. His appointment was substantially limited. The one day a month means he never did any pre-op. He never did any post-op. He never... And studies show that when you're... That when a physician is unprofessional prior to the surgery and doesn't treat the patient properly prior to the surgery, there can be... It can result in negative consequences. And he did... He wasn't doing that. He merely came to UNM, he performed the surgery, and it was technically well-regarded, no question about that, but he didn't have to deal with some of the other aspects of practicing medicine, aspects that were frankly exposing UNM to some serious risk. I think the one day a month was, at the time, the solution. Let's change the subject a minute. I'm a little concerned about Judge Browning's failure to or refusal to recuse. I'm wondering... The test is whether a reasonable person would doubt his impartiality. He was on the staff of the University of New Mexico as an adjunct professor of law. He wasn't getting paid money, but he was getting a free research assistant. I'm just a little troubled why a reasonable person would not have doubted whether he could be, was, would be impartial in a lawsuit against that very same university. Well, first of all, yes. He taught one class. He did not believe he was going to be teaching a class, teaching classes in the future. He was not on the permanent staff. No, but he was there, and he was teaching those students, and he was getting remuneration in the form of free legal, free assistance for it from a research assistant. It was more of a donation of what he was... No, he was receiving something of value. There's no doubt about that. The university gave him a law student to help without charge to help him do research, right? He diverted his paycheck to that student. Yeah. So he was getting remuneration from the university that was being sued before him. Why wouldn't a reasonable person say, wait, are you just a little too cozy with that university to hear my lawsuit against that university? Might I reasonably question that? Well... Impartial. Well, first of all, his connections with the University of New Mexico were not any closer than those of any other federal judge in the state, Your Honor. Secondly, there is a substantial case law from this circuit and others saying that judges who had closer ties to the university, for instance, there was a case involving, it was the Tenth Circuit, the Wilner case, in which the judge in question had close ties to the University of Kansas. He was on the Board of Governors of the law school for a while. He was a head of an alumni association. And that's a much closer tie, Your Honor. And finally, the time... We have the Burke case where it seems to me there'd be some similarity of affiliation so I just wondered if you have any other views. And the other issue is that Dr. Rivero, the appellant, was not, he didn't bring this up in a timely manner. He was sent two letters, we were both sent two letters, both sides were sent two letters explaining the judge's ties to the university. And in each of those letters he put, were greatly detailed. Nothing, nothing from the appellant, nothing from us either. And then shortly before the hearing on the motion for summary judgment, the chambers called each counsel and asked, okay, are you sure you don't have a problem? Again, nothing. There was no objection. Finally, they had the hearing on the motion for summary judgment. In fact, did he go further than that? Did he say, I'm okay with it or something like that? I think he did say he was okay with it, Your Honor. So it was fine. There was no indication that there was a problem. So your response is that he waived or didn't preserve that argument? That's one response, yes. He absolutely waived it. He only raised it after the judge gave his impression that he was going to rule for the defendant, Your Honor. So I want to quickly get to the constructive discharge issue. It is clear that Dr. Verro was not constructively discharged from his employment at UNM. He continued to work there, as you pointed out, one day a month. It was exactly the same. His employment there after the addendum was exactly the same as it was before. He would come one day a month. He admitted under oath in his deposition that he was not treated unfairly at all. No one interfered with him. All the issues regarding people bad-mouthing him, as he claims, a lot of that he didn't even know about. It stands to reason that if you're going to constructively discharge somebody, you need to do it directly to them. You can't express your concerns privately. There's obviously no intent to make his working conditions difficult. And there has to be an intent to make the working conditions difficult so that any reasonable person would find that they had no choice but to resign. And Dr. Verro claims that, well, that he had to do this mandamus action to get his file, and that that was somehow harassment. But at the end of the day, he stayed during the entire course of the mandamus action until he actually received his file, that he quit. And there was no one who encouraged him to quit. No one asked him to quit. In order to have constructive discharge, you need to basically tell a person that they're fired without saying, without using so many words. And none of that happened. He was, he was treated, he was... What's your case for that proposition? Do I understand you correctly? That you're saying that in order to be constructively discharged, you have to be fired? Well, no. You have to essentially be, they don't actually fire him, but they basically make his working conditions so difficult that intentionally, essentially, that anyone would, any reasonable person would find that they have no choice but to quit. And that wasn't the case. His working conditions were perfectly normal, perfectly fine, as he admitted, Your Honor. Except for asking him to have a psychiatric evaluation and basically make life pretty miserable for him, don't you think? Well, the psychiatric evaluation, that was, that was two, three years before he actually left. And there is a matter of time that you have to actually leave with a certain amount of time. And secondly, there are a number of cases, Bennett v. Quark is one of them, in which it's been held that a, even if the psychiatric evaluation were to be considered a discriminatory act, which I'm arguing it's not a discriminatory act, one discriminatory act isn't enough. A failure to promote, that's basically what this is, is failure to promote, is not enough to establish a constructive discharge. There has to be an ongoing pattern of harassment. And it didn't seem like, and after the addendum was done with, after, after the addendum was withdrawn, everything went back to normal as far as his working conditions were concerned. Yes, he had this pending lawsuit, but it did not impact his conditions of employment. And therefore, he was not constructively discharged. The district court decision should be upheld in its entirety. Thank you all very much, your honors. Thank you. Counsel, just a full minute, if you will, please. Just a second while we reset the clock. Thank you. Go ahead. Thank you, your honors. In response to Mr. Marcus's position, this was not a fitness for duty exam. This was a four-part battery of psychiatric examinations. Dr. Rivero had never been at risk of failing at his essential job functions. An essential job function for an orthopedic surgeon is orthopedic surgery. The complaints that were referenced, Mr. Marcus related UNM's position fairly clearly that there were, that you could insinuate or you could infer. There was no investigation of these complaints. There was no corroboration. And your honors, if, as a final note, with respect to the addendum and the psychiatric examinations, that allowing that to be permissible essentially opens up a note of limits. I'm going to allow myself one question because I was trying to get in earlier. Yes. Would you explain to me why, under Williams, you were unable in 2011 to meet the elements of that case? Recognizing that the case wasn't decided until 2017, but nevertheless, the law was pretty much as Judge Ebell was discussing it. That, under those terms, that he was an employee of UNM. Why couldn't you meet those two elements in 2011 is the question. Those two elements, if taken in their strict reading, could have been met. But the fact is that consideration of whether Dr. Rivero could have, in 2011, filed a viable complaint with substantial facts as required under Iqbal and Twombly diverges from that Williams standard. Thank you very much, counsel. Your counsel is excused. The case is submitted.